The last of the six days of furlough that are at issue in this case happened in September of 2013. Just days later, on October 1st, there was a shutdown of the federal government. All of the appropriated fund employees on that day had to stop working. The employees at issue in this case at both Waterfleet Arsenal and Letterkenny Army Depot remained working. We think that distinction starts the discussion about why the furloughs in this case make no sense and can't possibly meet the efficiency of the service standard. Did you actually make the efficiency of the service argument before your reply briefing? Yes. I mean, from the get-go, we operated under Chapter 75, and the entire standard upon which we made was a saying, under Chapter 75 requires the efficiency of the service standard. Well, it certainly does, but I understood your argument to be that the reason that the appropriate here is because they were looking at the wrong agency for purposes of deciding whose efficiency is more at issue. Well, it's tied up in the same analysis. So if you're... I mean, is there... Your argument is if you look at the local agency, the LEAD, or the other one, that there's not the efficiency of the standard met. Right. It's sort of where you look. So obviously, there's no dispute that there was a cut to appropriated funds at the national level. There's no dispute. There's also really no dispute in the record that there was abundant funding from customer orders at the local level. The agency has maintained, and argued to the board and to the arbitrators, that you just only look at the DOD level, you don't look at the local level to determine whether this was a reasonable... There's no evidence that there was actual efficiencies gained. That's the issue I'm asking about. Did you... That seems to have been waived because you don't raise that alternative argument until you're a fibrary. Well, we were rebutting their argument, which was we started with... We believe Chapter 75 is the proper construction of 75. As you look at the local level, these are the individual employees, and that's what you would do for the other actions under Chapter 75. In rebuttal to their argument that, well, no, you have to look at the national level, we made an argument that even if you look at the national level, it's customer orders that drive the funding of these local facilities, and there's no evidence at the national level that they moved money or saved money. Just pointing out that there's also a dissent in the board that these cases came out after the case of here, but in the Einbroden case, that same issue came up before the board, and we're just pointing out that this is an issue that's recurring because even if you look at the national level, there's really no indication that savings actually occurred because until the customer... I mean, it's very market-driven. Until the customer either slows down its spending or cuts its spending or retrieves its spending, I guess, there really are no savings, and as Member Wagner at the time pointed out, there's nothing in the record in those cases, and there's nothing in the record in this case that they ever notified Congress or otherwise did something to transfer the money out of the Working Capital Fund. I guess I have a bit of the same question that Judge O'Malley does, and I haven't sort of gotten a clear answer from you thus far about it, which is, so there's all kinds of arguments that we shouldn't be looking at DOD and DOD across the board. We should be looking at the agency level and that there was no efficiency of service for this agency if we're looking at the agency level. If we're looking at only the agency, that there was no efficiency. That argument I think you've made consistently, but the arguments that appeared in the reply brief felt like for the first time for me also was an argument that, well, wait a minute. Even if we look at the DOD level, these furloughs in this agency, the money saved there was not available for DOD to otherwise satisfy the budget issues it was having. That argument is discreet, and it's different. It's not DOD, is there efficiency of service for DOD if we look at the agency level? It's not, is there efficiency of service if we're tunnel visioning only at the breakdown lower level, local level? Your argument all of a sudden in the reply brief, which resonates with me, but I'm afraid isn't something that was consistently made so that it's not before me because they didn't get to address it, is that even if we look at the DOD level, those cuts don't provide money that DOD can use. That's a different efficiency of the service argument, it seems to me, than the one that focused on DOD and everything related to it or focused on the agency and everything related to it. I guess I'd have to respectfully say that we viewed it as one and the same because this is, right, so from the get-go, there's no dispute that customer orders are taken from this revolving fund and then placed at a particular facility, whether it's Letterkenny or Water Valley. But there is a question, and I would have loved to have known what the government would have had to say about it, but they didn't get a chance to because you didn't make it to your reply. There is a question for me about whether or not money saved by that agency, by furloughing those people, was or was not available for redistribution and repurposing to DOD more generally. That is a specific fact-based question that I have no idea of the answer to, and I didn't get a chance in any briefing to know what they might say about it because it wasn't there until the reply brief. Okay. And, well, I would suggest that during the hearing, we had two arbitration hearings, we had witnesses testify. We don't know how savings would occur without deallegating money at the local level. So that's why we sort of see it as one and the same. So if you don't deallegate money at the local level, it can't revert back up to this revolving fund, and therefore any furloughs at the local level are not really creating the type of savings or flexibility that the Army was arguing that had to happen at the national level and that the local people wouldn't know about. But there were some deallegations, were there not? So in the Letterkenny case, interestingly enough, their Chief of Resource Management, God understand, said there had been $37.5 million. Now, I don't believe he ever said when that occurred, but even taking that as true, if you look at Letterkenny, and I would refer you to Joint Appendix page 303, where it's a chart that has the funding, I can show it to you. And what's interesting about that chart is even if $37.5 million had been deallegated, if you look at that net carryover, on June 30th, right before the first furlough was approved, they were calculating $733 million was going to be carried over to the next fiscal year. They were so overfunded at the local level that they were going to carry over $733 million. So an interesting comparison is if you say, oh, the Hale document, the Hale Declaration says we needed $500 million in savings from Army Working Capital Fund, at least in theory, the Army could have gotten all $500 million in savings from this facility alone, and this facility still carried $233 million into the next fiscal year. I'm not saying they had to do that. I know. That gets into the discretionary decision of how they're going to go about choosing to affect the savings. And our point is that in this part of the government, those decisions are driven by the customer. And so when the board says we're not going to second guess spending per se, our position is we're not either. We're going to look at what did the customers do with that money. And if the customers spent the money at the local level, then the employees shouldn't be furloughed. If the customers at the national level don't spend the money at the local level, then sure, furlough the employees because there's now a lack of work or a lack of funds. But does it have to be there? Does there have to be evidence that they used the money for something else? Or is it sufficient, as the government has recently said, that they created the possibility, the flexibility to use the money? Right. Well, we dispute both. You can't create the flexibility until you've deobligated the money. And other than this $37 million, which had no real impact on the local facility, in the Waterfleet case, we had the chief of resource manager testify for us in that case. And he said, no money has to be deobligated, so where's the flexibility coming from? So right there, that's your first question about whether there really was flexibility created. Because until a customer takes the order back and puts the money back at the national level for that flexibility, we don't think... Well, funds were deobligated from LEED, right? Right. Maybe. Again, I think if you look at the record closely, that witness didn't really specify when that occurred. Well, the arbitrator's decision said that. Yeah, sure. And my point on that, though, is even if that was, even if LEED contributed $37.5 million to the flexibility that the Army needed, they're so overfunded that there's still no sufficiency of the service for furloughing the employees at LEED, because they've contributed their money to the flexibility. But yet, you're assuming that the efficiency of the service is being measured at the local level. Sure, sure. I mean, that is our primary argument, because Chapter 75 has always been interpreted that way, that the employee misconduct requires that the individual employee needs to be suspended or suspended. And is there any other context, either in statute or regulation or case, in which any WCS have been treated as agencies? Well, I think we have to look, and this is sort of answering a question, but not exactly the way you posed it, because again, that's why we point to the shutdown. The Army already delineates between funding types, because otherwise these employees wouldn't work during the shutdown. There was no appropriated funds. So the odd part of this is that there's like a 10% cut to funding and the appropriated funds, but you can't work. But there's a 100% cut to appropriated funds. Well, you can keep working because you're funded. So the agency already distinguishes between the funding. Right, but part of the problem is that the statutory provision that we're operating under uses the word agency. Sure. And so it doesn't say local employing entity. It doesn't say the funding entity. It says agency. So how do we get around the fact that that's what the statute is? Well, because just like every case that comes up here from the Board regarding misconduct, it's always the employee versus the larger agency. But it's still the agency's job to prove at the local level that the employee either deserved a suspension or should have been reduced in grade. I mean, the proof, the preponderance of the evidence still always goes to the individual employee or the similarly situated employees, which is our main argument here is these employees, if you look at the funding, it is distinct. They're very distinct at the local level. And so it is not, and also obviously distinct because when there's a shutdown, they don't have to work or they keep working. So the Army already looks at the local level to see whether, or that commonality is already there at the local level. So it's not like water bleeds funding and lead funding are intermixed and you can't figure out the two. When you look at the record, it's very clear. They have to manage their own operation. They have to go out and market themselves. They have to bring in orders and they work off those orders. And so the market kind of already takes care of itself. So if the customer, if they lose their customer base, even if there's lots of appropriations or fiscal times are very good, those particular facilities may still have to furlough because they have to manage their workforce via the customer base, not whether Congress is appropriating funds. I'm into my rebuttal time. Thank you very much. Ms. Stern. Good morning. May it please the Court. Petitioner's opening brief set the parameters of their arguments on appeal. And that brief sole argument that petitioners made was that under Chapter 75, only the arbitrator should have looked to the working capital funds organizations where the petitioners were employed rather than the Department of Defense. In our response, we demonstrated that the statutory definition of an agency covered the Department of Defense or the Department of Defense met that statutory definition and the working capital funds organizations actually did not meet that statutory definition. Also, when we look at the efficiency of the service standard, the Board has held, and this Court appeared to endorse in its Berlin decision, that the proper standard in a furlough situation is whether the agency has made a reasonable management decision to meet the financial circumstances under which it's operating. In this case, given the evidence of the interrelationship between the budgets of the working capital funds organizations and the budget of the Department of Defense as a whole, it was certainly a reasonable management decision for the Department when they were hit with this Department of Defense-wide budget shortfall to look at the interrelated budgets and to make decisions based on the agency's budget as a whole. But when you say a reasonable management decision, doesn't that management decision still have to tie into anticipated efficiencies for the service? It absolutely does, Your Honor. And the furlough decision has to be judged at the time that the decision was made and not sometime later after the furloughs have been instituted down the line. So at the time the furloughs were made, the Department of Defense had a $37 billion shortfall in their budget. They had already tried every which way to avoid furloughing employees, and in fact, $35 billion of that furlough, excuse me, of the budget shortfall were made up in other ways, by cutting back on programs, by cutting back on travel, training, equipment, but there was still a $2 billion shortfall that could not be met without looking to furloughing employees. And of that budget shortfall, one quarter came from the working capital funds organizations. There's an affidavit in the record from Deputy Secretary Hale, who's basically the chief financial officer for the Department of Defense, and he went through an analysis of why that could be in part made up from the working capital funds organizations. And Secretary of Defense Hale's memo where he outlined which employees were going to be furloughed really indicates that the Department of Defense thought very carefully about which employee furloughs would result in actual savings that could be recaptured and which could not. So certain categories of employees, even the savings of not paying their salaries, it was determined that those would not in fact result in actual savings for the department that could potentially be shifted elsewhere. But the working capital funds employees, it was determined that those funds could potentially be shifted. And again, potentially because the furlough has to be judged at the time that it's implemented. The fact that six months later, the agency was able to get approval from Congress to reprogram certain monies or was able to save some money in other areas and therefore in the end didn't need to recapture and repurpose those savings, that's not the basis on which the furlough is judged. It's judged at the time, like every adverse action, it's judged at the time that it's imposed. At the time these furloughs were imposed, the government saw that it could save X amount of dollars, I believe it was $500 million in working capital funds employee salaries and that those savings would provide the Department of Defense the flexibility to partially meet its huge budget shortfall. I guess I understand that there are predictions that were made about the potential for this filling the budget shortfall or correcting the gap. I guess I still am having a hard time factually seeing the connection between these salaries and the bigger DOD budget shortfall. I don't see in those affidavits that you're referring to anybody actually explaining to me how the funds transfer occurred and what happened to those funds. Well, they didn't actually occur because by the time further down the road, the Department of Defense actually got permission. They had pending before Congress some requests to reprogram funds that had already been authorized by Congress to be spent on certain programs. They had requested permission to reprogram those funds to be spent elsewhere. When the furloughs were imposed, those reprogramming requests were pending before Congress. They weren't authorized until July after the furloughs had already been decided and the notices issued. That allowed the agency to save some money that it couldn't predict back when it was first imposing the furloughs. The agency was also able to realize some other savings down the road just by tightening the budget in various ways. Eventually, ultimately, they did not need to recapture the savings that were realized by not paying employee salaries for six days, but they could not have known that at the time that the furloughs were imposed. At that time, they were operating under one set of facts that required them to find $2 billion in employee savings salaries. It's no different than, well, often when we're talking about the national budget, we kind of refer to a household budget. I'm going to use that analogy here. If you had a two-career, two spouses both working and one of them loses their job, then the two spouses may look at each other and say, wow, our income has now just been cut in half. We need to sell the car because we're going to have all these expenses coming up in the next few months. We have the cable bill and we have food and we have rent. Let's sell the car. It's possible that two months later, the spouse that lost his job finds a new job that requires him to have a car or her to have a car, and they end up having to buy a different car for even more money, so that ultimately when you look back at 2020 hindsight, say, wow, if we would have known that you were going to get a job, we would never have sold that car. But at the time the decision was made to sell the car, that couple knew that they had a shortfall, they had expenses coming up, they didn't see a way to meet it other than to sell the car. That's what happened here. The Secretary saw that there was a big budget shortfall, that part of that could be made up by saving salaries. Yes, six months later, eight months later, down the road, it turned out that they were able to make up the shortfall with authorization from Congress to repurpose or reprogram funds with savings that they were able to realize other places. Exactly how would they have gotten that money? Exactly how, given the separateness of the working capital funds and their funding sources, how would that money that was saved in the six days of employee furlough have ever been transferred over and repurposed to DOD? In two ways, Your Honor. First of all, they're really not as separate as the petitioners would like to make out, and that's what the arbitrator found. Because the monies that flow into the working capital funds organizations are, in fact, appropriated fund monies. No, they're not appropriated directly from Congress, but they are paid from other Department of Defense organizations that receive appropriated funds. So those organizations are taking appropriated funds from Congress and transferring them to the working capital funds. So they are, in fact, appropriated funds that can be deobligated at any time. But they would have to have a huge amount of deobligation before you would ever tap into the savings from these salaries, right? Not necessarily. And there was evidence... They were all overfunded by a lot. Yes, but the Department of Defense did... There was evidence in the record that the Department did anticipate the deobligating of funds, that funds had been deobligated in the past. Some funds were deobligated in 2013. And again, this was all based on projections. But given that the statute says that it will improve the efficiency of the service, wouldn't it have made a lot more sense for them to wait and see if funds were going to be deobligated to the point where furloughing employees actually made sense versus just furloughing employees without any consideration of the status of the deobligation? Well, I would say it was reasonable for the agency to conclude that they didn't have the luxury of waiting. They had to make a decision. They had less than half or about half of the fiscal year left with an enormous budget hit. And they had to figure out where that money was coming and give people enough notice, both in their personal lives and the agency in terms of planning. But that's the problem. The problem is, you know, it's like you're saying 1% is enough to meet the preponderance of the evidence standard. That's the way I feel like your argument is going. It's like you're saying the fact that maybe if a lot of stuff was decommissioned such that, you know, the money went way, way, way down, then we could actually benefit from the furlough cutoff. You're right. We have to look at what was the state of the agency, of the DOD, of the fact pattern at the exact time the furlough decisions were made. Well, at that time, there was a lot of money committed to these WCFs. So much of it would have to be pulled back and decommissioned, an amount that sort of would be historical in nature, quite frankly, looking at the history of the commissioning process. Under those circumstances, was it a reasonable decision to assume that that money from furloughing those people for those six days would be able to be repurposed to DOD? That's not is there a possibility it could have been. But Judge O'Malley is correct. It's will promote the efficiency of service. Will, not might, not possibly could, not on an alternate Tuesday. Right. And so looking at that fact pattern as all of those financials existed on that day that decision was made, doesn't seem reasonable to me. On that day that that decision was made, the agency knew for a certainty that that decision was saving them, for all the working class funds, $500 million that would give them the flexibility. And it was that flexibility that promotes the efficiency of the service. Not whether after the fact the agency did repurpose it or whether it definitely would. It's too harsh a standard. That's the standard that's suggested in the Einbone and dissent, that it's going to happen basically. That's too strict a standard to impose on an agency. Even if it doesn't have to be that far. You're talking about, you keep saying it's going to give them the flexibility, but flexibility to what? Deobligate everything? Flexibility to take that salary savings, even putting aside the deobligating of the funds, flexibility to take that salary savings for the six days that those employees were not working, money was saved by not paying their salaries. Those salary savings could not be transferred. They could be transferred. They absolutely could be transferred. How? Because the agency has the authority to take money saved at the working capital funds and transfer them elsewhere in the organization and repurpose them elsewhere in the department. They have that authority. That's the arbitrator found. That was the interrelated nature of these organizations, that those funds from the salaries themselves, that those savings could be repurposed elsewhere. That was perceivable at the time and that gave them flexibility. I guess I just somehow missed what you're saying now. I understood that decommissioning could occur and thereby money could move, but you're telling me the agency could transfer that money directly. We don't need to even think about decommissioning. The agency had the ability to just transfer those savings directly right away to DOD to be used for the shortfall. To the best of my understanding, the money saved from the salaries themselves, money from working capital funds organizations, including salary money, could be used elsewhere within the department. How did they do that, though, if they're separately appropriated funds? Because all the funds come under the authority of the Department of Defense. The secretary has authority over all of them, over the working class funds. It's just another fund. It's just another budget. It's just like they had to go to Congress to ask to move appropriated funds. They would have to go to Congress to ask to move those funds. And they were going to Congress regularly during this time to ask to reprogram and to repurpose. But you're saying that they could just take it isn't true. They would have had to go to Congress to ask to take it. Yes, of course, but saving the money in the first place would give them the flexibility to be able to go to Congress and ask for permission to transfer those particular funds to other parts of the Department of Defense. If they didn't save the money in the first place, then the money wouldn't be available for them to do that. I have one question. Are the salaries, the day-to-day salaries of the people at these capital fund entities, are they paid by the money from the projects that come in? Yes. Or is there... Yes. What would happen if, for some reason, this is hypothetical, but in a year, in a given year, a particular entity had no business? In other words, what if none of the components of DOD sent any sort of contracts to that entity? What would happen? Well, again, these are revolving funds, so generally they have a carryover. Hard to imagine, but given that hypothetical... No, I understand. Yeah. Presumably, they would have a carryover from prior years because it's a revolving fund. If they had no money in their fund carryover, I really don't know the answer to that question. I'm sorry to say... Because I saw some reference to the fact that, initially, these entities are set up with appropriated funds. Yes, thank you. I was just going to come back to that. I was just going to make that point. That, initially, when they are set up, they are set up with appropriated funds, so I don't know that this is... For a fact, what would happen in that hypothetical situation, but since they were initially set up with appropriated funds, if, in fact, there were no funds coming in for a year, I suppose perhaps they could get an appropriation. Again, I really don't know the answer to that. Thank you, Your Honor. Thank you. I'm actually happy to answer that question. Ah, thanks. Like any business, if your customer base dries up, you eventually have to change your workforce because you've lost the infusion of money that happens to your company. These facilities work like any company. You have to go out and get customers. Your customers obligate funds, and then you either have the money to do the work or you don't have to do the work. That actually is our exact point here. The efficiency of the service at these facilities takes care of itself. If there's money, if the customers like the product and they buy the product, then the employees work the product and they earn their money. But it is true that it also has another advantage, like a business that most government entities don't have, which you're allowed to carry funds over from year to year. Sure, because as they ably pointed out in their brief, it's these new year funds. It's either obligated or not obligated. Letterkenny, for example, had so many orders that they couldn't even do all the orders in one year. It spread out over time, and so they carry over an excess amount of money. They were actually carrying over $311 million above the max of what they're supposed to be carrying over. Right, but they don't have to do like most government entities do, which is to return money at the end of the year. Right, they don't. Exactly. The efficiency of the service takes care of itself in these facilities because if the government's going to save money, the customers are going to take back their orders. And then if the customers take back their orders and reprogram the money, then the employees might get furloughed. And it makes sense, right? So if you are funded by an appropriated fund like the majority of DOD employees, you are directly impacted by a cut to the appropriations. These employees are indirectly funded. Their salaries make up a portion of what the order amount is that comes in. So if you place a $500 million order or $50 million order, the labor costs are factored into that $50 million plus parts and the other things like that. And so the efficiency of service takes care of itself because if the orders dry up, you then have to furlough the employees because there's a lack of work or a lack of funds. It actually works quite well under Chapter 75 in the definition of a furlough. Okay. I thank both counsel for their arguments. This case is taken under submission. All rise.